Lackvic, MD v. Littleton Hosp.        CV-96-337-SD  11/21/96

UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEW HAMPSHIRE


Michelle Lackovic, M.D.


        v.                                Civil No. 96-337-SD


Littleton Hospital Association;
 d/b/a Littleton Regional Hospital;
Littleton Hospital Association
 Medical Staff;
Robert A. Peraino, M.D.


                         O R D E R


        In this diversity action, plaintiff Michelle Lackovic, M.D.,

brings several state law claims, including breach of contract,

defamation, and intentional infliction of emotional distress,

against the defendants in connection with the suspension of her

Intensive Care Unit (ICU) privileges at defendant Littleton

Hospital Association.

        Presently before the court is defendants' motion to dismiss

Counts I, II, and V of the complaint for failure to state a claim

under Rule 12(b)(6), Fed. R. Civ. P.  Plaintiff has filed an

objection to the motion as well as a motion to amend the

complaint to add additional defendants and to clarify certain

claims.

<u>Background</u>[1]

In 1989 plaintiff Michelle Lackovic, M.D., a physician trained in internal medicine in Pennsylvania, was recruited by defendant Littleton Hospital Association (the Hospital) to establish a family practice and weight clinic in Whitefield, New Hampshire. Dr. Lackovic and the Hospital entered a Physician Recruitment Agreement. Under the Agreement, Dr. Lackovic was to establish an internal medicine practice in Whitefield, while at the same time maintaining active medical staff and clinical privileges in internal medicine at the Hospital. Although she was required to make a good-faith effort to use the Hospital for services, she retained the right to admit or refer her patients elsewhere under certain circumstances.

In July of 1990 Dr. Lackovic opened her office in Whitefield in a building owned by the Hospital. She also applied for and obtained privileges at the Hospital, which required her to provide coverage of the ICU at the Hospital, a duty shared by Dr. Emil Pollak, a cardiologist, and Dr. Robert Peraino, a nephrologist. Each of the three physicians was "on call" at the ICU every third week on a rotating basis. The on-call physician was required to be available 24 hours per day for patients

---

[1]In keeping with the duty imposed by Rule 12(b)(6), the court will take all allegations of the plaintiff's complaint as true for the purposes of resolving defendants' motion to dismiss.

needing admission to the Hospital or who had no regular physician, and was also required to assume complete care of the other two physicians' ICU patients from 5:00 p.m. Friday until 8:00 a.m. Monday.

In March of 1992, Dr. Lackovic purchased another office building in Whitefield and relocated her practice because the building owned by the Hospital had deteriorated. In her new office, she established a successful family practice, as well as a weight-loss clinic required by the Recruitment Agreement. She also bought blood chemistry equipment and gave her patients the option of having their testing done by her, the Hospital, or elsewhere. Her patients tended not to choose the Hospital, which sometimes charged as much as 100 percent more than elsewhere. According to the complaint, the Hospital resented this turn of events and terminated the Physician Recruitment Agreement three months early, on the baseless ground that Dr. Lackovic's practice had primarily developed into a weight-loss clinic and she was not fulfilling her ICU obligations.

The complaint also alleges that Dr. Peraino believed that Dr. Lackovic, as a woman and a new physician, should unquestioningly follow his recommendations and that he resented her because she sometimes exercised her independent judgment when it differed from his. In addition, Dr. Peraino wanted additional

3

on-call hours to enhance his income and viewed Dr. Lackovic as a competitor.

During the week beginning January 21, 1994, two patients (one suffering from a perforated duodenal ulcer and another in post-cardio-respiratory arrest) were transferred to the ICU when Dr. Lackovic was on call. Dr. Peraino was scheduled to cover the ICU for the weekend and assumed responsibility for the care of both patients, although he was allegedly unhappy about the prospect of caring for two complex medical conditions during the weekend.

On January 30, 1994, Dr. Peraino submitted a letter to Dr. Pollak, Director of the ICU, requesting the immediate suspension of Dr. Lackovic's ICU privileges. He claimed that Dr. Lackovic's treatment of the patients had placed them in imminent danger and leveled a total of 28 charges of malpractice and misconduct against her. Dr. Peraino hand delivered the letter to Dr. Lackovic at her home the next day.

Dr. Peraino soon met with Dr. Pollak and Parker A. Towle, M.D., Chief of Medical Services at the Hospital, and discussed the charges against Dr. Lackovic. Without speaking to Dr. Lackovic or otherwise investigating the matter, Dr. Towle summarily suspended Dr. Lackovic's ICU privileges pending review by the Executive Committee, which was scheduled for February 3,

4

1994.  Following the Hospital's bylaws, Dr. Towle formed an ad hoc committee comprised of himself, Dr. Pollak, and Dr. Kathleen Smith, a family practitioner.  The committee met with Dr. Lackovic on February 1, 1994, but she could not address the issues raised by Dr. Peraino because she did not have all of the relevant medical records.  Over the next few days, members of the committee met with Drs. Lackovic and Peraino, reviewed the medical charts, and reviewed Dr. Lackovic's detailed written rebuttal to each of the charges made by Dr. Peraino. Dr. Peraino, however, presented no medical literature or other evidence to support his allegations.

On February 8, 1994, the committee issued its findings and recommendations and forwarded them to the executive committee of the medical staff as required by the bylaws.  That committee found evidence to support 3 of the 28 charges of substandard care, but no evidence to support the remaining 25 charges.  Dr. Peraino was not reprimanded or disciplined by the committee for bringing the baseless charges.  The committee did, however, recommend that Dr. Lackovic's ICU privileges be restored only on the condition that she obtain 20 hours of continuing medical education credit in critical care medicine and that her treatment of ICU patients be monitored and approved by Drs. Peraino and Pollak for a three-month period.  During such period, she could

admit patients to the ICU only by obtaining the signature of the on-call physician.

Six days later, a special meeting of the executive committee was convened, at which it accepted the recommendations of the ad hoc committee and notified Dr. Lackovic of its decision. The executive committee advised Dr. Lackovic that if she accepted the recommendation, the Hospital would not have to file a report with a national databank and/or the State Board of Medical Examiners, which could have potential adverse effects on her ability to practice medicine.

As the findings of neither committee could support the summary suspension of her ICU privileges, Dr. Lackovic could not accept the proposed conditions for the restoration of her ICU privileges. She particularly found it unreasonable that she be supervised by Dr. Peraino, who had filed false charges against her, as well as by Dr. Pollak, who unquestioningly accepted such charges.

Over the next few weeks, Dr. Lackovic made repeated requests that her ICU privileges be restored without condition and also requested that the matter be referred to a peer review committee of the New Hampshire Medical Society to determine the reasonableness of the findings and conditions imposed by the executive committee. The Hospital did not respond to such

6

requests.

Dr. Lackovic was formally notified by the Hospital of its adverse recommendation concerning her ICU clinical privileges on April 1, 1994. Said notice set forth appeal procedures Dr. Lackovic could follow to appeal the decision and stated that a hearing could be conducted by an ad hoc hearing committee, whose members were not identified. The notice also contained an explanation of the Hospital's policies regarding reporting suspension of her privileges to the National Practitioner Databank. According to the complaint, "[t]his detailed explanation made it clear that unless Dr. Lackovic accepted the conditions imposed on her, she would be reported." Complaint ¶ 40.

Soon after receiving this notice, Dr. Lackovic asked that she be temporarily relieved of certain of her Hospital duties. In contravention of its standing practice, the Hospital refused to allow Dr. Lackovic a temporary leave of absence.

Given the unsupported allegations of malpractice and misconduct, the Hospital's rejection of her requests for unbiased peer review, and the Hospital's refusal to give her a temporary leave of absence, Dr. Lackovic "felt she had no option but to resign from the medical staff of the Hospital." Id. ¶ 43. Dr. Lackovic submitted her written resignation and requested another

7

hearing and appellate review of the executive committee's decision.

The Hospital subsequently notified Dr. Lackovic that she could not both resign and pursue an appeal, and Dr. Lackovic withdrew her resignation. The Hospital then scheduled a hearing[2] before a hearing committee on May 24, 1994, said committee to be composed of five medical staff members with no prior involvement in the case. Prior to the date said hearing was to have taken place, the Hospital reported its allegedly defamatory findings against Dr. Lackovic to the National Practitioner Databank and to the New Hampshire medical authorities.

After a hearing, the hearing committee issued a decision on June 16, 1994, rejecting one of the findings of the executive committee and affirming the two other findings of misconduct against Dr. Lackovic. It also approved the restoration of Dr. Lackovic's ICU privileges, under the same prior conditions. Four days later, the Hospital notified Dr. Lackovic that the suspension of her ICU privileges would be continued unless she accepted the recommendations of the hearing committee.

On July 5, 1994, Dr. Lackovic requested that the Hospital submit the remaining two issues to an unbiased peer review

---

[2]Under the Hospital's bylaws, none of the previous committee meetings had constituted "a hearing on the merits of the charges."

8

committee of the New Hampshire Medical Society. She indicated that the issues needed to be resolved with the input of an unbiased pulmonologist and infectious disease specialist. Under the rules of the medical society, such a peer review could only occur by agreement of all parties. On July 25, 1994, the Hospital notified Dr. Lackovic that her case would be placed before an appellate review committee comprised of some of the Hospital's trustees and several of the Hospital's doctors. On August 2, 1994, a hearing before the appellate review committee was held to hear Dr. Lackovic's case. She submitted a letter objecting to the conditions imposed, particularly that of having to report to Dr. Peraino. The committee affirmed the original recommendations. On September 12, 1994, the Hospital formally notified Dr. Lackovic of its decision and informed her that her privileges to admit patients to the ICU were terminated, effective immediately, unless she agreed to comply with the earlier-set conditions. Although Dr. Lackovic subsequently requested that the matter be heard before the New Hampshire Medical Society, the Hospital never responded to this or to any other of Dr. Lackovic's requests. Dr. Lackovic resigned on November 4, 1994.

Discussion

1. Rule 12(b)(6) Standard of Review

To resolve defendants' Rule 12(b)(6) motion, the court must "take all well-pleaded facts as true," Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1216 (1st Cir. 1986), and extend the plaintiff "every reasonable inference in [her] favor." Pihl v. Massachusetts Dep't of Educ., 9 F.3d 184, 187 (1st Cir. 1993) (citing Coyne v. City of Somerville, 972 F.2d 440, 442-43 (1st Cir. 1982)). A Rule 12(b)(6) dismissal is appropriate "'only if it clearly appears, according to the facts alleged, that the plaintiff cannot recover on any viable theory.'" Garita Hotel Ltd. Partnership v. Ponce Fed. Bank, F.S.B., 958 F.2d 15, 17 (1st Cir. 1992) (quoting Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 52 (1st Cir. 1990)).

2. Intentional Infliction of Emotional Distress (comprising part of Count V)

To state a claim for intentional infliction of emotional distress under New Hampshire common law, plaintiff must allege that through extreme and outrageous conduct defendants intentionally or recklessly caused severe emotional distress. See Morancy v. Morancy, 134 N.H. 493, 495-96, 593 A.2d 1158, 1159

10

(1991) (citing RESTATEMENT (SECOND) OF TORTS § 46 (1965)).  Accord

Miller v. CBC Cos., 908 F. Supp. 1054, 1067 (D.N.H. 1995).

Under the RESTATEMENT, it is not enough that defendant acted

intentionally, even if such intent rises to the level of criminal

intent or malice.  Instead, defendant's conduct must be

sufficiently extreme and outrageous; it must be

> so outrageous in character, and so extreme in
> degree, as to go beyond all possible bounds
> of decency, and to be regarded as atrocious,
> and utterly intolerable in a civilized
> community.  Generally, the case is one in
> which the recitation of the facts to an
> average member of the community would arouse
> his resentment against the actor, and lead
> him to exclaim, "Outrageous!"
>   The liability clearly does not extend to
> mere insults, indignities, threats,
> annoyances, petty oppressions, or other
> trivialities.

RESTATEMENT (SECOND) OF TORTS § 46, comment d.

It is for the court, not the jury, to initially determine

whether defendants' conduct could be construed as "so extreme and

outrageous as to permit recovery."  RESTATEMENT (SECOND) OF TORTS §

46, comment h.  The court notes that successful claims for

intentional infliction of emotional distress typically arise from

conduct that was unusually atrocious or outlandish.  See

Wagenmann v. Adams, 829 F.2d 196, 214 (1st Cir. 1987) (arresting

and imprisoning and then committing innocent man to mental

institution on eve of daughter's wedding constitutes outrageous

11

conduct) (interpreting Massachusetts law).

In support of her claim that the Hospital is liable for intentional infliction of emotional distress, plaintiff makes a long series of assertions, many of which pertain to the nature of the proceedings leading up to the conditional suspension of her ICU privileges. Plaintiff asserts, inter alia, that (1) the Hospital suspended her ICU privileges without properly investigating Dr. Peraino's charges or giving her a sufficient chance to rebut them; (2) the two claims of substandard care that remained viable after the 26 were thrown out were not sufficient, standing alone, to justify the suspension of her ICU privileges; (3) the requirement that she be supervised by Drs. Peraino and Pollak for three months was arbitrary and unreasonable given that Dr. Peraino had levied false charges against her; (4) the Hospital recklessly ignored Dr. Peraino's personal animus against her; (5) the Hospital refused to give her independent review before a committee of her qualified peers, instead relying on its own physicians, who were unqualified in critical care; and (6) the Hospital went against a standing policy and refused to grant Dr. Lackovic a temporary leave of absence pending resolution of the matter.

Assuming the truth of the allegations, the Hospital's behavior may have been unreasonable or even reprehensible, and

12

the alleged deficiencies in the Hospital's review system may not have protected the plaintiff as fully as they might have. Moreover, the Hospital may have exercised poor judgment in requiring that Dr. Lackovic be supervised by Dr. Peraino. However, the court cannot find as a matter of law that the allegations against the Hospital rise to the level of outrageous or outlandish behavior necessary to sustain a claim for intentional infliction of emotional distress. Cf. Santiago-Ramirez v. Secretary of Dep't of Defense, 62 F.3d 445, 448 (1st Cir. 1995) ("courts have allowed employers some latitude in investigating possible employee conduct") (interpreting Puerto Rican law of intentional infliction of emotional distress); see also Chakrabarti v. Cohen, 31 F.3d 1, 6 (1st Cir. 1994) (finding that hospital staff's misstatement of facts concerning doctor's competence and its committing of procedural errors leading to his termination were not "extreme and outrageous") (interpreting Massachusetts law of intentional infliction of emotional distress).

The claim against Dr. Peraino has more merit, but founders as well. Assuming the truth of plaintiff's allegations, Dr. Peraino's knowing filing of at least 26 false charges of malpractice with the Hospital review committee may well have been tortious or otherwise contrary to the law, but it is not behavior

13

that is so extreme or beyond the pale of human decency so as to support a claim for intentional infliction of emotional distress. Of particular relevance to the court's decision is that Dr. Peraino brought the charges to an independent body for its review and substantially complied with the Hospital's procedures. The court further notes that it has considered plaintiff's claim that Dr. Peraino knew that his ten-year history with the Hospital gave him more credibility with the committees than Dr. Lackovic would have and that his accusations involved medical issues outside the expertise of the medical staff serving on such committees. Absent any allegations that Dr. Peraino exercised undue influence over the committees, however, plaintiff's assertions still fall short of showing that Dr. Peraino acted outrageously.

Accordingly, the court grants defendants' motion to dismiss plaintiff's claim for intentional infliction of emotional distress.

3. Defendants' Remaining Arguments

The defendants have also moved to dismiss the breach of contract claim (Count I) against the medical staff, the intentional interference with contractual relations claim in its entirety (Count II), and the negligent infliction of emotional distress claim (comprising part of Count V). Given that

14

plaintiff has requested such claims be withdrawn, the court grants defendants' motion to dismiss and offers no further comment on their merits. Plaintiff also offers an argument to support her defamation against the Hospital (Count IV). However, as defendant has not moved to dismiss such claim, the court will not rule on the matter at this time.

## 4. Plaintiff's Motion to Amend the Complaint to Include Additional Defendants

Plaintiff has moved to add Robert A. Pearson; Quorom Healthcare, Inc.; Parker A. Towle, M.D.; Emil M. Pollak, M.D.; Kathleen Smith, M.D.; and Ramesh Dave, M.D. as defendants to this action. Defendants have not objected.

Rule 15(a), Fed. R. Civ. P., provides that where a party seeks to amend a pleading more than 20 days after said pleading has been served, a party may amend only by leave of court or by written consent of the adverse party. Rule 15(a) further provides that "leave [to amend] shall be freely given when justice so requires." Thus, before denying a motion to amend, the court must be able to find a valid reason to support the denial, such as undue delay, bad faith, dilatory motive on the part of the movant, or futility of the amendment. See Grant v. News Group Boston, Inc., 55 F.3d 1, 5 (1st Cir. 1995) (citing

15

<u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962)).

In support of its motion to amend, plaintiff notes that very little time has passed, not more than three months, since she first filed the complaint and that the defendants would not be prejudiced by the addition of the new parties. Accordingly, the court grants plaintiff's motion to amend the complaint, with the proviso that the claims dismissed by virtue of this order remain dismissed.


## Conclusion

For the reasons set forth above, the court grants defendants' motion to dismiss (document 6) Counts I (breach of contract against medical staff), II (interference with contractual relations), and V (negligent infliction of emotional distress) and plaintiff's claim for intentional infliction of emotional distress (Count V). Furthermore, the court grants in part plaintiff's motion to amend the complaint (document 12). The court grants all of plaintiff's proposed amendments except to the extent she seeks to include a claim for intentional infliction of emotional distress against the Hospital and Dr.

Peraino.  The clerk is directed to docket the amended complaint as of the date of this order.

SO ORDERED.

_____
Shane Devine, Senior Judge
United States District Court

November 21, 1996

cc:   All Counsel

17